UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60657-RAR

**OFFSHORE MARINE TOWING, INC.**,

    Plaintiff,

v.

**ARTURO GISMONDI**, *in personam*, and
**"M/V SEA U L8TER,"** a 2018 53-foot HCB,
document number 1297047, her engines,
tender, tackle, equipment, furnishings, and
appurtenances, *in rem*,

    Defendants.
_____/

## ORDER GRANTING MOTION TO REDUCE SECURITY

Under maritime salvage law, a vessel owner benefitting from a salvor's rescue must pay a price for the recovery of his vessel. Here, Plaintiff seeks compensation for towing Defendant's vessel in the amount of $220,000.00—or approximately 20% of the value of the salvaged vessel. *See* Am. Compl. [ECF No. 3]. The question is whether this salvage reward is appropriate given the nature of the services rendered.

On March 30, 2020, the Court granted Plaintiff's Motion for Issuance of Warrant of Arrest for the Vessel. *See* Order Directing Clerk to Issue Warrant of Arrest [ECF No. 9]. Thus, on April 9, 2020, Defendant Arturo Gismondi posted $330,000.00 into the Court Registry in order to release his vessel.[1] However, taking issue with the amount of security, Defendant subsequently filed a Motion for Prompt Post-Seizure Show Cause Hearing and Memorandum to Support Vacating Seizure and/or Reducing Security Posted [ECF No. 25] ("Motion"). The Court has reviewed the

---

[1] Security was set at $330,000.00 because the contract between the parties calls for a bond to be posted at 1.5x the amount of the bill for salvage services. *See* [ECF No. 3-1].

Motion, Plaintiff's Response in Opposition [ECF No. 33] ("Response"), and the accompanying exhibits. For the reasons set forth below, it is hereby

**ORDERED AND ADJUDGED** that the Motion [ECF No. 25] is **GRANTED** insofar as it seeks to reduce the security posted.

## BACKGROUND[2]

On the afternoon of March 19, 2020, Arturo Gismondi, together with his wife and 9 guests, were aboard the SEA U L8TER—a 2018 53-foot HCB ("Vessel"). *See* Florida Boating Accident Investigation Report ("Accident Report") [ECF No. 33-1]. On or about 6:00 PM, the Vessel ran aground as Mr. Gismondi attempted to enter the Hillsboro Inlet in Pompano Beach, Florida. *Id.* Simultaneously, Captain William Sisler, of Offshore Marine Towing, Inc. ("Offshore"),[3] received a report that a 50-foot vessel was aground on the north jetty of the Hillsboro Inlet. *See* Declaration of Captain William Donald Sisler ("Sisler Decl.") [ECF No. 33-2] ¶ 3. Upon receiving the report, Captain Sisler checked the tide chart, which indicated high tide would be occurring at approximately 6:15 PM. *Id.* ¶ 4. Given the fast-approaching high tide, Captain Sisler quickly proceeded to the grounding site because he realized prompt action would be necessary to assist the Vessel before the tide dropped. *Id.*

Upon arrival, Captain Sisler observed 11 persons aboard the Vessel. *Id.* ¶ 8. From aboard his own vessel (a 28-foot aluminum hulled Sea Ark) he confirmed that everyone was wearing a

---

[2] The recitation of the facts herein varies slightly from the factual background set forth in the Court's Order Granting Plaintiff's Motion to Enforce the Arbitration Agreement and to Stay Case [ECF No. 45]. Said variations are attributable to the fact that the Court has now had the benefit of reviewing several declarations and other pieces of evidence provided in connection with the instant Motion.

[3] Offshore is a commercial towing and salvage company based out of Pompano Beach, Florida. Am. Compl. ¶ 2. The company runs a large and sophisticated salvage operation as evidenced by the fact that it maintains 11 salvage vessels worth in excess of $1,600,000.00. *See* 2020 Physical Inventory Offshore Marine Towing, Inc. [ECF No. 33-13].

lifejacket, and no one needed medical attention. *Id.* ¶¶ 8-9. The Vessel was resting on its keel and small waves (less than 2 feet in height) crashing onto the jetty were causing the Vessel to rock side to side slightly. *See* Video Filing [ECF No. 34].[4] For the safety of both vessels, Captain Sisler decided to anchor near a lighthouse about 500 feet away from the Vessel. *Id.* ¶¶ 9-10. He grabbed his toolbox containing "hose clamps, rags, epoxy, damage control plus, gaskets, lashing lines and [a] salvage agreement" and walked across the north jetty to reach the Vessel. *Id.* ¶ 11.

Once he reached the Vessel, he checked the bilges and confirmed they were dry. *Id.* ¶ 13. Captain Sisler then informed Mr. Gismondi and his wife that their Vessel was in a "salvage situation," offered his assistance as a representative of Offshore, and presented a one-page (double-sided) agreement titled "Standard Form Marine Salvage Agreement" ("Salvage Agreement"). *Id.* ¶¶ 15, 19. Captain Sisler further explained that assistance would not be "an hourly job and that the fee for salvage would be told to them after the salvage." *Id.* ¶ 15. Some back-and-forth discussion ensued, and although Mrs. Gismondi was reluctant to sign the agreement, Mr. Gismondi ultimately agreed to the service and signed the Salvage Agreement provided by Captain Sisler. *Id.* ¶¶ 16-19. Mr. Gismondi handed Captain Sisler two American Express credit cards which Captain Sisler photographed, as well as a $100 bill which Captain Sisler returned. *Id.* ¶ 19. Captain Sisler reiterated that he was providing a salvage service and Mr. Gismondi would be billed later. *Id.*

Once Mr. Gismondi signed the Salvage Agreement, another Offshore towboat (a 29-foot Ambar with twin 300 horsepower engines) approached Captain Sisler at the Vessel. *Id.* ¶ 20. The Offshore tow boat secured a 100-foot line to the Vessel and after 10-15 minutes managed to safely pull the Vessel off the north jetty. *Id.* ¶¶ 21, 23. The Vessel was towed to Wahoo Bay where

---

[4] Video footage provided by Plaintiff corroborates the Court's description of the grounding scene upon arrival. *See* Plaintiff's Notice of Filing Video Via Conventional Filing as Evidence in Support of Response to Defendants' Motion to Vacate ("Video Filing") [ECF No. 34].

Captain Sisler put on diving gear and inspected it for bottom damage. *Id.* ¶ 22. According to Captain Sisler's observations, "all four skegs on the motors were broken, all four propellers were damaged, and there was one broken lower unit (gear box)." *Id.*

Once the Vessel was freed, Offshore requested to maintain possession and haul it out to a marina in Pompano so it could be more thoroughly inspected by a certified mechanic to check for hull and engine damage. *Id.* ¶ 24. Mr. Gismondi refused to let Offshore maintain possession of his Vessel. *Id.* Despite Offshore's request, Mr. Gismondi removed the tow lines and steered the Vessel back, on its own bottom and power, to his home marina at Royal Palm Yacht Club. *Id.*

## LEGAL STANDARD

The arrest of a vessel is "an in rem procedure in admiralty law having an ancient lineage." *Salazar v. Atlantic Sun*, 881 F.2d 73, 76 (3d Cir. 1989). Where, as here, a vessel is arrested pursuant to a verified complaint in admiralty, Rule E(4)(f) of the Supplemental Federal Rules of Civil Procedure for Admiralty and Maritime Claims governs the procedure for release from arrest. It states, in relevant part, that "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated . . . ." FED. R. CIV. P. SUPP. ADM. R. E(4)(f).

The purpose of such a post-arrest hearing is to afford due process to the vessel's owner. *S & S Diesel Marine Servs., Inc. v. M/V F–TROOP*, No. 11-CV-60020, 2011 WL 1899402, at *8 (S.D. Fla. May 18, 2011). To that end, the plaintiff must prove that the arrest or attachment was supported by "reasonable grounds." *George v. A 2005 Donzi Motor Yacht, Hull Identification Number DNAFA 008A505*, No. 09-CV-81145, 2009 WL 3417707, at *1 (S.D. Fla. Oct. 22, 2009). The plaintiff's burden is not an onerous one. *S & S Diesel*, 2011 WL 1899402, at *9-10. Indeed, the Eleventh Circuit has cautioned against district courts conducing a "mini-trial" at this stage of

the case. *PDS Gaming Corp. v. M/V Ocean Jewell of St. Petersburg*, No. 07-10088, 2007 WL 2988798, at *1 (11th Cir. Oct. 5, 2007).

Notwithstanding the propriety of arrest, "Supplemental Admiralty Rule E(5)(a) provides for the release of an arrested vessel on the giving of security, to be approved by the court or clerk." *S & S Diesel*, 2011 WL 1899402, at *11 (internal quotation marks omitted). Further, the Court "may, on motion and hearing, for good cause shown, reduce the amount of security given[.]" FED. R. CIV. P. SUPP. ADM. R. E(6). In determining whether and how to reduce security under Rule E(6), a court should weigh "the reasonableness of plaintiff's damages claim . . . and other equitable considerations." *Transportes Navieros Terrestres S.A. de C.V. v. Fairmount Heavy Transp., N.V.*, 572 F.3d 96, 108 (2d Cir. 2009).

## ANALYSIS

### A. *Offshore's Efforts Constitute Salvage*

Salvage is a "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended." *McConnochie v. Kerr*, 9 F. 50, 53 (S.D.N.Y. 1881). To determine whether a salvage occurred, the court must find three elements: (1) marine peril; (2) voluntary services rendered; and (3) success in whole or part. *The Sabine*, 101 U.S. 384, 384 (1880). The Court shall address each in turn.

#### 1. *Marine Peril*

The existence of maritime peril is a necessary element for a valid salvage claim. To determine whether a maritime peril existed, the court examines whether, at the time the assistance was rendered, the vessel was in a situation that might expose her to loss or destruction. *Lewis v. JPI Corp.*, No. 07-CV-20103, 2009 WL 3761984, at *3 (S.D. Fla. Nov. 9, 2009). However, the danger need not be immediate or actual. *See, e.g., Southernmost Marine Services, Inc. v. One (1)*

*2000 Fifty Four Foot (54") Sea Ray Named M/V "Potential"*, 250 F. Supp. 2d 1367, 1377 (S.D. Fla. 2003) ("[A] marine peril exists where a vessel is in danger of being partially or totally lost and where it is not being successfully salved when the plaintiff voluntarily undertakes its salvage operation."). All that is necessary is "reasonable apprehension of injury or destruction if the [salvage] services are not rendered." *Phelan v. Minges*, 170 F. Supp. 826, 828 (D. Mass. 1959).

Most courts encountering a vessel driven aground on rocks, shoals, or reefs have found that a hard grounding is per se marine peril. *See Cayere v. Malta Mediterranean Shipping Co.*, No. 12-CV-01122, 2012 WL 3112330, at *2 (D. P.R. Apr. 4, 2012) (and cases cited therein); *see also* 3A *Benedict on Admiralty: The Law of Salvage* § 64 (2020) (hereinafter "*Benedict.*"). In *Boat Raising & Reclamation v. Victory*, No. 06-CV-00078, 2007 WL 4462995, at *10 (M.D. Fla. Dec. 14, 2007), a distressed vessel ran aground on a seawall. The owner believed he could float the vessel when high tide came, but the Court found it could not have been done, since the receding hurricane surge and the rising tide would have essentially offset and would not have been sufficient to float the vessel. *Id.* at *8. Thus, the Court concluded that plaintiff established the existence of a maritime peril from which the vessel could not have been rescued without the plaintiff's assistance. *Id.*

Here, sufficient evidence supports a finding that the Vessel ran aground near the rock and coral surrounding the north jetty at the Hillsboro Inlet.[5] *See* Video Filing [ECF No. 34]; Sisler

---

[5] Defendants contend that the Vessel ran aground on sand and not on rock/coral, but other than their own assertions, Defendants have not provided any evidence to that effect. Mot. at 2-3, 9. At this stage, due to the lack of evidence supporting Defendants' position, the Court cannot definitively rule out the possibility that the Vessel may have been at least partially resting on sand. However, the Court has examined satellite images of the location of the grounding using the coordinates provided in the Accident Report (26°15'29.1" N / 80°04'50.8" W). A review of said images places the Vessel's grounding site within proximity to the jetty. Additionally, at least one arbitrator deciding a dispute involving a boating accident at the Hillsboro Inlet has concluded that hard groundings are likely given the submerged reef and coral formations found in the channel. *Coastal Towing & Salvage, Inc. v. M/V OVATION*, No. 3801, Soc'y of Mar. Arbitrators, Inc. (Sept. 12, 2003). Specifically, in *Coastal Towing*, the arbitrator expressed he could "not believe that the

Decl. ¶ 3; Accident Report [ECF No. 33-1]. Stranded on that rocky surface while vulnerably resting on its keel, the Vessel was left at the mercy of wind and water which could have pushed it in such a way as to damage it further. Sisler Decl. ¶¶ 5-6.

Defendants' claim that the Vessel "would have likely been naturally lifted off . . . by the rising tide," Mot. at 2, is not plausible given that the grounding occurred during high tide shortly before a falling tide, Sisler Decl. ¶ 4. Defendants also contend the Vessel was under no maritime peril because "there was no breach to the hull, no water ingress, no threat to the environment, [and] no threat to person or other property . . . ." Mot. at 9. In making this argument, Defendants fail to recognize that the peril necessary to give rise to a claim for salvage need not be immediate or absolute. *The Plymouth Rock*, 9 F. 413, 416 (S.D.N.Y. 1881). Indeed, the "apprehension of danger" test—developed by courts over a century of admiralty jurisprudence—contemplates only the *potential* for danger. Here, the Court finds that although the Vessel was not in immediate or absolute danger, the evidence suggests it was at least in minimal *apprehension* of danger. Thus, for purposes of this preliminary matter, the Court finds that the Vessel was in marine peril.[6]

### 2. *Voluntary Services Rendered*

The Court finds the element of voluntariness is satisfied here. Voluntary service is rendered in the absence of a legal duty or obligation. *See The Clarita*, 90 U.S. 1, 16-17 (1875).

---

vessel was soft aground, on only sand, silt or mud" since the sides of the Hillsboro Inlet channel are steep and cut from coral, and "[t]he damage to the bottom and propellers demonstrate[d] that there was some hard content to the bottom, either rock, hardpan, or more likely, coral." *Id.* Given the Hillsboro Inlet's inherent features and the evidence presented by Plaintiff, the Court finds it reasonable to conclude that the Vessel was likely hard aground.

[6] At this stage of the proceedings, the Court only notes that there are reasonable grounds to believe that the Vessel was in marine peril. To support an actual salvage award down the road, Plaintiff will need to prove conclusively that marine peril existed, and any award they receive will take into account factors not considered by the Court at this time—including, but not limited to, evidence regarding the tide and the condition of the grounding site.

"Whatever may be the motive impelling the true volunteer in undertaking the enterprise—whether for reasons of monetary gain, whether to aid in his own rescue, or even where his services have been offered through error—it cannot detract from the [voluntary] status which the law accords to him." *Benedict*, § 68. Thus, professional salvors—who perform their services for monetary gain—may claim salvage awards. *The Camanche*, 75 U.S. 448 (1869).

In this case, Offshore had no legal duty to salvage the Vessel.[7] It is not a governmental entity and was not under any other legal obligation to act as it did. Because Offshore acted without a legal duty to salvage the vessel, it acted voluntarily. *Bureau Wijsmuller v. United States*, 702 F.2d 333, 338 (2d Cir. 1983); *Unnamed Master & Crew v. Certain Unnamed Vessel*, 592 F. Supp. 1191, 1194 (S.D. Fla. 1984) (motive is not a determining factor in assessing voluntariness).

### 3. *Success in Whole or Part*

Finally, the salvage operation was a success. Lack of success, no matter how great the effort, will preclude a salvage award. *The Blackwall*, 77 U.S. 1, 12 (1869); *Benedict*, § 88. The rationale justifying this element of a salvage claim is that the purpose of engaging in a salvage operation is to render a beneficial service to the owner or vessel. Hence, when no benefit is conferred, the salvor is precluded from obtaining a reward. *The Enos Soule*, 95 F. 483, 484-85

---

[7] Defendants argue that Offshore could not have been acting voluntarily because it was acting under its contractual duty pursuant to the Salvage Agreement signed by the parties. Mot. at 5, n.3. Defendants' argument is without merit because it fails to recognize that "not every salvage contract results in contract salvage." Andrew Anderson, SALVAGE & RECREATIONAL VESSELS: MODERN CONCEPTS AND MISCONCEPTIONS, 6 U.S.F. Mar. L. J. 203, 207 (1993). To be clear, maritime law distinguishes between pure salvage and contract salvage. In a pure salvage situation, the salvor is a volunteer and the "compensation is dependent on success." *The Elfrida*, 172 U.S. 186, 192 (1989). "The existence of a salvage contract is typically raised as a defense to a pure salvage claim in order to escape the application of the more generous pure salvage award rule." *Evanow v. M/V Neptune*, 163 F.3d 1108, 1115 (9th Cir. 1998). However, where a contract, like the one at issue here, does not contain either an agreement to pay a given sum or to pay without regard to success, but provides only that the salvor will be entitled to an award in the event of success on a "no cure-no pay" basis, the services do not become contract salvage but retain their status as pure salvage services. *The Camanche*, 75 U.S. 448 (1869).

(S.D.N.Y. 1899). Here, as a voluntary—although professional—salvor, Offshore conducted the salvage operation and ultimately succeeded in removing the Vessel from peril.

Accordingly, this Court concludes that Offshore's efforts likely constituted salvage and thus Defendants' Motion to Vacate the Arrest warrants denial. Having found that reasonable grounds exist for issuing the arrest warrant in this case, the Court now turns to Defendants' alternative request for the Court to reduce the security posted.

### B. The Security Must Be Reduced

The value of a salvage award "is largely a matter of fact and discretion, which cannot be reduced to precise rules, but depends upon a consideration of all the circumstances of each case." *The Connemara*, 108 U.S. 352, 359 (1883). To calculate the value of a successful salvage operation the court must consider the long-standing six-factor test established by the Supreme Court in *The Blackwall*. 77 U.S. at 14. The six factors, in order of their relative importance, are:

(1) The degree of danger from which the property was rescued;

(2) The value of the property saved;

(3) The risk incurred by the salvors in securing the property from the impending peril;

(4) The promptitude, skill and energy displayed in rendering the service and saving the property;

(5) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed; and

(6) The labor expended by the salvors in rendering the salvage service.

*Benedict* § 237; *Treasure Salvors v. Unidentified, Wrecked and Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1340 (S.D. Fla. 1983). A court must consider all six factors to determine the proper award, *B.V. Wijsmuller*, 702 F.2d at 340; however, the degree of danger from which the property

was rescued tends to be the most important factor in determining the amount of the award.[8] *Benedict* § 245; *Cobb Coin Co., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, 549 F. Supp. 540 (S.D. Fla. 1982); *Ocean Servs. Towing & Salvage, Inc. v. Brown*, 810 F. Supp. 1258, 1263 (S.D. Fla. 1993); *Conolly v. S.S. Karina II*, 302 F. Supp. 675 (E.D.N.Y 1969).

### 1. *Degree of Danger from which the Vessel was Rescued*

As explained above, the Court has found the Vessel was in "minimal" apprehension of danger. Although this minimal apprehension is sufficient to meet the element of a marine peril, it is not enough to warrant a high order salvage award. This salvage operation occurred in broad daylight, while the seas were relatively calm, the weather clear and sunny, and a few feet from the beach in water so shallow that Captain Sisler was able to walk across it to reach the Vessel. *See* Video Filing [ECF No. 34]; Sisler Decl. ¶ 11.

The Court finds Offshore's narrative that the "seas were working the boat from side to side" to be overstated. Resp. at 12. While the Vessel appeared to be slightly rocking as a result of the surf, video evidence indicates the absence of an immediate or absolute threat of harm, and "once free [the Vessel] traveled on its own bottom and power to its dock without aid[.]" Mot. at 14. Offshore's claim that the Vessel would have been severely damaged if it would have remained at the sight of grounding for another 12 hours, Resp. at 12, is highly speculative and further presupposes that Mr. Gismondi would have allowed his $1.25m yacht to remain in a grounding situation for hours.

Ultimately, when comparing the conditions here to other rescues taking place in open water—namely during stormy conditions where life and limb are at stake—it becomes abundantly

---

[8] Varying degrees of peril to both the vessel and the salvor are almost always present. A situation of little peril to the grounded vessel or to the towing vessel results in a low order salvage award. *See, e.g., Ulster S.S. Co. v. Cape Fear Towing & Transportation Co.*, 94 F. 214 (5th Cir. 1899); *Beach Salvage Corp. of Florida v. The Cap't. Tom*, 201 F. Supp. 479 (S.D. Fla. 1961).

clear that the circumstances surrounding this salvage operation did not present any true degree of danger to justify a high order salvage award.

### 2. *Value of the Salvaged Vessel*

The Court must also consider the value of the salvaged Vessel. Initially, the Vessel (including its 4 motors) was estimated to be worth between $1,000,000.00–$1,250,000.00. *See* Resp. at 12; *see also* Declaration of Chloe Collins ("Collins Decl.") [ECF No. 33-9] ¶¶ 7,13. Assuming Offshore's estimates are accurate, the Vessel suffered approximately $50,000.00 in damages. *Id.* ¶ 13. Thus, the Court calculates the lowest post casualty value assignable to the Vessel would be approximately $950,000.00.

### 3. *Risk Incurred by Offshore in Securing the Vessel from Peril*

The Court finds the risk incurred by Offshore to be minimal given the many hazards ordinarily encountered at sea. "It is risks out of the ordinary for men of that calling which are recognized and liberally rewarded in salvage cases." *Benedict*, § 264. Offshore argues that "Captain Sisler risked personal injury to . . . get onto the [Vessel] two separate times by walking across the north jetty rocks in the waves" and as a result "[h]e was knocked down or slipped two times." Resp. at 11. But the risk taken here was not extraordinary in nature and, in any event, the potential for injury was augmented by Captain Sisler's own poor judgment. When Captain Sisler arrived at the grounding site there was no visibly imminent threat to the Vessel, and he confirmed (without leaving his boat) that everyone on the Vessel was wearing a life jacket, and no one was injured. Sisler Decl. ¶¶ 8-9. Captain Sisler could have minimized his risk by waiting for the second Offshore towboat to arrive before he attempted to reach the Vessel to secure the tow rig. There was simply no need for him to walk over to the Vessel twice, unless, of course, the primary motivation for the first walk across the jetty was to make sure a certain Salvage Agreement was executed.

### 4. Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Vessel

Offshore promptly arrived on the scene within minutes of receiving report that a 50-foot vessel had run aground on the north jetty. *See* Sisler Decl. ¶ 3. Offshore is a professional salvor with over 30 years of experience and its team of four men in three towboats were properly equipped to rescue the Vessel. Collins Decl. ¶¶ 5, 8-10. The evidence further demonstrates Offshore—albeit motivated by pecuniary gain—was exceptionally energetic in pulling the Vessel away from the jetty towards the Wahoo Bay and securing the safety of the Vessel, all in under 15 minutes. Sisler Decl. ¶¶ 22-23.

### 5. Value of the Property Employed by Offshore in Rendering the Service and the Danger to Which Such Property was Exposed

Offshore deployed a team of men in three vessels with a combined present value of $475,000. *Id.* ¶ 7. Offshore's vessels carried pumps, hoses, dive gear, patching materials, and other gear if the circumstances warranted it. *Id.* ¶¶ 7, 10. Although three vessels were deployed, ultimately only one towboat (a 29-foot Ambar with twin 300 horsepower engines) was needed to pull the Vessel off the jetty and it was able to do so within a relatively short amount of time. Sisler Decl. ¶¶ 22-23. Indeed, the evidence does not establish that this was the type of salvage operation that would have required three towboats to be on scene. The Offshore team was exposed to the dangers inherent in the professional salvaging business.

### 6. Labor Expended by Offshore in Rendering the Salvage Service

The time and labor expended here were minimal. The Vessel readily came off ground. No special equipment was required or used. The ungrounding can be regarded as routine and simple, especially for a professional salvage team such as Offshore.

In summary, considering all the *Blackwall* factors together, as this Court must, the Court finds Offshore's justifications for claiming the exorbitantly large salvage award of $220,000.00

(20% of the salvage value of the Vessel) simply do not hold water.  Because the salvage operation was a low-level ungrounding effort with little peril, in conjunction with the other factors discussed above, the Court finds a low order salvage award of 1% of the lowest possible salvage value of the Vessel ($950,000.00) is appropriate here.

## **CONCLUSION**

For the reasons set forth above, it is hereby

**ORDERED AND ADJUDGED** that the Motion to Reduce Security [ECF No. 25] is **GRANTED** and the $330,000.00 security is hereby **REDUCED** and **SET** at $9,500.00.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 27th day of November, 2020.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**